UNITED STATES DISTRICT COURT FOR THE
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------------X
RYAN MINETT,

                                        Plaintiff,

        -against-                                          **COMPLAINT**

                                                           **Index No.**
THE CITY OF NEW YORK; NEW YORK CITY MAYOR
BILL DE BLASIO; NEW YORK POLICE DEPARTMENT
("NYPD") COMMISSIONER DERMOT SHEA; NYPD
DEPUTY COMMISSIONER FOR LEGAL MATTERS
ERNEST F. HART; NYPD DEPUTY INSPECTOR
ROBERT O'HARE; NYPD OFFICER CHRISTOPHER
EMMART, SHIELD # 13299; JOHN DOE NYPD
SERGEANT NO. 1; JOHN AND/OR JANE DOE NYPD
MEMBERS 2-6; and JOHN DOE 7 NYPD LEGAL
BUREAU SUPERVISOR,

                                        Defendants.

------------------------------------------------------------------------X

        Plaintiff RYAN MINETT, by his attorneys, Gideon Orion Oliver and COHEN&GREEN

P.L.L.C., hereby complains of Defendants as follows:

                        **PRELIMINARY STATEMENT**

        1.      In June and July of 2020, demonstrators participated in an "Occupy City Hall"

demonstration in and near City Hall Park, in which protesters sought, among other things, police

accountability, as well as commitments from the City of New York to decrease funding to the

New York City Police Department ("NYPD") budget.

        2.      On July 3, 2020, Plaintiff RYAN MINETT, who was and is a law student, was

volunteering as a Legal Observer ("LO") for the National Lawyers Guild – NYC Chapter

("NLG-NYC") at an "Occupy City Hall" demonstration when New York City Police Department

("NYPD") members, including the individual Defendants named above, seized and arrested him

                                        1

without lawful justification, in retaliation for his conduct in observing and documenting police response to protests in a public space.

3.      Just before his arrest, Mr. Minett had been trying to get an arrestee's name, and find out where NYPD members were going to take him for arrest processing, when Defendant NYPD Deputy Inspector Robert O'Hare arrested Mr. Minett and ordered other NYPD member Defendants to arrest Mr. Minett. Rather than thinking the better of it and releasing Mr. Minett, Defendant O'Hare, with the assistance of Defendant NYPD Officer Christopher Emmart and others, trumped up false charges against Mr. Minett, subjecting him to false prosecution between July 3, 2020 and February 8, 2021, when all charges against him were dismissed on grounds consistent with Mr. Minett's innocence.

4.      Mr. Minett's July 3, 2020 arrest was not the first time last summer that NYPD members arrested NLG-NYC Legal Observers. For example, on June 4, 2020, after days of sustained protests and brutal NYPD response in the wake of the May 25, 2020 police murder of George Floyd in Minneapolis, MN, NYPD members planned and executed a violent attack on a "FTP4"[1] protest in the Mott Haven area of the Bronx, (the "FTP4 Protest" or the "Mott Haven Protest"). As part of that assault, NYPD members, including a NYPD Legal Bureau attorney, targeted a dozen NLG-NYC Legal Observers for assault and arrest.

5.      The June 4, 2020 NYPD assaults and arrests of 1 NLG-NYC Legal Observers are now the subject of litigation in *Hernandez, et al. v. City of New York, et al.,* 21-CV-7406 (CM)(GWG). Plaintiffs incorporate by reference all of the allegations in the operative pleading in *Hernandez.*

---

[1] "FTP" stands for many things, including "Free the People," "Feed the People,"  and, in the context of certain anti-police protests, "Fuck the Police."

6.      As pleaded more fully in *Hernandez*, although Defendants, including New York City Mayor Bill de Blasio, NYPD Commissioner Dermot Shea, NYPD Deputy Commissioner of Legal Matters Ernest Hart, and other high-ranking Defendant City officials have known about NYPD members' targeting, uses of force against, arrests of, prosecutions of, and other violations of the rights of NLG-NYC Legal Observers and other bystanders and observers of police activities in public spaces, they have not meaningfully supervised, trained, investigated, or disciplined any of the NYPD members who ordered and/or participated in connection with the *Hernandez* matter or related to arresting or prosecuting Mr. Minett, or taken other measures to address the violations of Mr. Minett's rights or to ensure that similar violations of his rights or the rights of other Legal Observers are not repeated in the future.

7.      Therefore, Plaintiff now brings suit seeking money damages, attorney's fees, costs and expenses, as well as a declaratory judgment and prospective injunctive relief to prevent Defendants from violating Plaintiff's rights, and the rights of others who wish to observe and document police activities in New York City public spaces, in the future.

## JURISDICTION AND VENUE

8.      Plaintiff brings this action pursuant to 42 U.S.C. § 1983, the First, Fourth, Fifth, Sixth, and Fourteenth Amendments to the United States Constitution, and New York law.

9.      This Court has jurisdiction over Plaintiff's federal civil rights claims herein pursuant to 28 U.S.C. §§ 1331 and 1343, and over Plaintiff's New York law-based claims under 28 U.S.C. § 1367.

10.     The Federal Declaratory Judgment Act, 28 USC §§ 2201 and 2202, authorizes this Court to grant Plaintiff the declaratory relief Plaintiff prays for herein.

11.     Rule 65 of the Federal Rules of Civil Procedure authorizes this Court to grant Plaintiff the injunctive relief Plaintiff prays for herein.

12.     Venue is proper pursuant to 28 U.S.C. § 1391, *et seq.,* in the Southern District of New York, where Defendant City of New York has offices, and the actions complained of herein occurred.

## GENERAL MUNICIPAL LAW COMPLIANCE

13.     Plaintiff timely served a Notice of Claim on the municipal Defendant and complied with all conditions precedent to commencing an action under New York law.

14.     At least thirty days have elapsed since service of Plaintiff's Notice of Claim and adjustment and payment thereof has been neglected or refused.

15.     Plaintiff has initiated this action within one year and ninety days of the accrual of Plaintiff's claims pursuant to New York State Law.

## PARTIES

16.     At all times mentioned herein, Plaintiff RYAN MINETT (Mr. Minett, he/him) was a resident of Queens County in the City and State of New York.

17.     At all relevant times mentioned herein, Defendant City of New York ("New York City" or "NYC") was and is a municipal corporation duly organized and existing under and by virtue of the laws of the State of New York and acts by and through its agencies, employees and agents, including, but not limited to, the NYPD and their employees.

18.     Defendant New York City Mayor BILL DE BLASIO was at all times relevant to this Complaint, and still is, the Mayor of New York City. As Mayor, Defendant de Blasio, at all relevant times, was and is an elected officer and the "chief executive officer of the city," NYC Charter Section 3, who was "responsible for the effectiveness and integrity of city government

4

operations," NYC Charter Section 8, and had final authority to appoint and/or remove the New York City Police Commissioner, NYC Charter Section 431. He is sued individually and in his official capacity.

19.     Defendant NYPD Commissioner DERMOT SHEA was at all times relevant to this Complaint, and still is, the Police Commissioner of the NYPD. As Police Commissioner and the "head," NYC Charter Section 8, and "chief executive officer of the police force", NYC Charter Section 434, Defendant Shea, personally and/or through his authorized delegates, at all relevant times had final authority to promulgate and implement administrative and managerial policies and procedures, including policies and procedures as to personnel hiring, training, supervision, and discipline with respect to NYPD officers' performance of their duties, and constituted a City policymaker for whom the City is liable. NYC Charter Section 434. He is sued individually and in his official capacity.

20.     Defendant NYPD Deputy Commissioner for Legal Matters ERNEST F. HART was at all times set forth herein the NYPD's Deputy Commissioner for Legal Matters. Upon information and belief, Defendant Hart was directly responsible for ensuring that NYPD Legal Bureau attorneys deployed in connection with the FTP4 Protest and the July 3, 2020 protest at which Mr. Minett was arrested and other protests, including Defendant John Doe 7 NYPD Legal Bureau Supervisor, were properly trained and supervised, and acted in a lawful and constitutional manner in performing their official duties. He is sued individually and in his official capacity.

21.     At all times hereinafter mentioned, Defendants NYPD DEPUTY INSPECTOR ROBERT O'HARE; NYPD OFFICER CHRISTOPHER EMMART, SHIELD # 13299; JOHN DOE NYPD SERGEANT NO. 1; JOHN AND/OR JANE DOE NYPD MEMBERS 2-6; and

JOHN DOE 7 NYPD LEGAL BUREAU SUPERVISOR were NYPD members who violated Plaintiff's rights, as set forth and described more fully below.

22.     The numbered Doe Defendants are members of the NYPD whose names are currently unknown to Plaintiff.

23.     At all times hereinafter mentioned, Defendants were employed by the City of New York as members of the NYPD.

24.     At all times hereinafter mentioned, Defendants, either personally or through their employees, were acting under color of state law and/or in compliance with the official rules, regulations, laws, statutes, customs, usages and/or practices of the State or City of New York.

25.     Each and all of the acts and omissions of the Defendants alleged herein occurred while said Defendants were acting within the scope of their employment by the Defendant City.

26.     Defendants were duly appointed and acting officers, servants, employees, and agents of Defendant City who were acting for, and on behalf of, and with the power and authority vested in them by Defendant City, and were otherwise performing and engaging in conduct incidental to the performance of their lawful functions in the course of their duties.

27.     Defendants were each and all responsible, in whole and/or in part, for the planning for and/or creation, promulgation, implementation, and/or enforcement of the unconstitutional policies, practices and/or customs complained of herein, and/or condoned, acquiesced in, adopted, and/or approved of the same, through their acts and/or failures to act, as set forth more fully below.

28.     At all times relevant herein, and as set forth more fully below, Defendants' actions and/or failures to act were malicious, intentional, knowing, and/or with a deliberate

indifference to or a reckless regard for the natural and probable consequences of their acts and/or omissions.

29.     Although they were aware of the conduct, present for it, and knew or should have known it was unconstitutional, at no time did any of the Defendants, or any other member of the NYPD, take any steps to intervene in, prevent, or otherwise limit the unconstitutional conduct engaged in by their fellow officers.

## STATEMENT OF FACTS

### A.  The National Lawyers Guild ("NLG") – NYC Chapter ("NLG-NYC") Legal Observer Program.

30.     According to its website (http://www.nlg.org), the NLG "was founded in 1937 as an association of progressive lawyers and jurists who believed that they had a major role to play in the reconstruction of legal values to emphasize human rights over property rights. The Guild is the oldest and most extensive network of public interest and human rights activists working within the legal system." The NLG-NYC is a local NLG chapter.

31.     NLG-NYC Legal Observers have been observing and documenting NYPD response to protests in the City streets since the late 1960's and are well-known to NYPD members.

32.     The NLG's Legal Observer program was established in 1968 in New York City in response to protests at Columbia University and city-wide antiwar and civil rights demonstrations.

33.     NLG-NYC Legal Observers are legal workers, law students, and lawyers trained by the NLG-NYC to observe and document police response to protests.

34.     When a Legal Observer completes the NLG-NYC's Legal Observer training, the NLG-NYC issues them a bright neon green hat, as well as a badge on a lanyard, which prominently feature the NLG-NYC logo and the words "LEGAL OBSERVER."

35.     These items clearly identify their wearers as NLG-NYC Legal Observers to all – including NYPD members:

  

**B.  <u>The NYPD's Historical Treatment of Observers and Bystanders, Including Legal Observers</u>**

36.     The First Amendment to the United States Constitution, and the attendant provisions of the New York Constitution, protect the rights to observe and document the activities of uniformed police in traditional public for a such as the New York City streets, including police responses to protest, and arrest activity, subject to reasonable time, place, manner restrictions.

37.     In derogation of those rights, the NYPD has a long history, pattern, practice, and custom of unlawfully curtailing the rights of witnesses and those who seek to document such police activities, including by using force on, arresting, and/or prosecuting bystanders and observers, including, but not limited to, press.

38.     In 1977, the NYPD entered into a Stipulation and Order in *Black v. Codd*, 73 Civ.

5283 (JMC) (SDNY, June 1, 1977). The *Black v. Codd* Stipulation and Order states:

> [I]t is the policy of the New York City Police Department and the defendants that
> when a person (or persons) is detained, stopped or arrested in public areas, a
> person or persons not involved in the conduct of which the first person is stopped
> or arrested may remain in the vicinity of the stop or arrest as an onlooker or
> onlookers, subject to the safety of the person stopped, the third persons, the
> general public, and officers of the Police Department, and to provisions of law
> e.g. P.L. § 195.05.

39.     The *Black v. Codd* Stipulation and Order defines an "onlooker" as a "person

remaining in the vicinity of a stop or arrest" and states that onlookers "shall not be subject to

arrest for violation of Penal Law § 195.05 unless the officer has probable cause to believe a

violation of § 195.05 exists."  It further states that "[t]aking photographs" and "[r]emaining in

the vicinity of the stop or arrest" explicitly do not "constitute[] probable cause for arrest or

detention of an onlooker unless safety of officers or other persons is directly endangered or the

officer reasonably believes they are endangered or the law is otherwise violated." The *Black v.

Codd* Stipulation and Order also requires that the arresting officer shall "report the action" of a

bystander arrest to a supervisor at the precinct.

40.     The *Black v. Codd* Stipulation and Order has historically been ignored.  *See, e.g.,

Tonge v. Kelly*, 19993 WL 16121 (EDNY, 1993) ("the City failed for ten years to maintain the

formal guidelines to which it had agreed and to inform its police recruits and officers in its Patrol

Guide of the standards established in the *Codd* consent order").

41.     Relatedly, the version of the NYPD Patrol Guide ("PG") that was in effect in June

of 2020 recognizes the rights of people to observe, photograph, and record police activity in

public places without interfering with police operations.

42.     For example, PG § 203-29 (When a Member of the Service Encounters an Individual Observing, Photographing, or Recording Police Activity), issued on June 12, 2018, stated: "Individuals have a right to lawfully observe and/or record police activity including, but not limited to detentions, searches, arrests or uses of force."

43.     PG § 203-29 further instructed NYPD members that they must "NOT:

(1) Threaten, intimidate, or otherwise discourage an observer from recording the police officer's activities; or
(2) Intentionally block or obstruct cameras or other recording devices when there is no legitimate law enforcement reason to do so; or
(3) Delete any pictures or recordings from observer's recording device or order observer to delete such pictures or recordings."

44.     Additionally, PG § 203-29 dictated that, unless they engage in other actions that are independent violations of the law, "an individual CAN NOT be arrested for:

(1) Taking photographs, videotaping, or making a digital recording;
(2) Requesting or making note of shield numbers or names of members of the service;
(3) Criticizing the police or objecting to police activity;
(4) Refusing to leave the area; or
(5) Using crude or vulgar speech."

45.     Beyond that, PG § 203-29 included examples of the kinds of conduct that give rise to the sort of "[a]ctual interference with the performance of an official function" that is typically required to support the arrest of a person observing, photographing, or recording police activity, as follows:

…actual physical force (touching or physically interfering with the officer or the suspect, i.e., using a camera so close to the officer's face that it intentionally obstructs his or her view), or intruding into the physical space necessary to safely perform police operations and refusing to obey an order to move back, or purposefully engaging in passive behavior that prevents an officer from taking enforcement action (i.e., blocking a prisoner van, etc.).

46.     Additionally, in the event the NYPD were to arrest someone who is observing, photographing, or recording police activity, PG § 203-29 required the NYPD members involved to inform a supervisor.

47.     Beyond that, with respect to the rights of Legal Observers specifically , the version of PG § 213-11 (Policing Special Events/Crowd Control) that was in effect in June of 2020 explicitly permitted properly identified Legal Observers "free access through police lines at the scene of any demonstration… subject only to restrictions necessitated by personal safety factors"; requires "[a]ll" police to "extend every courtesy and cooperation to" them; and directed: "Observers shall be permitted to remain in any area, or observe any police activity, subject only to restrictions necessitated by personal safety factors, as determined by the incident commander."

48.     Despite the written policies reflected in PG § 203-29, between the time PG § 203-29 was inaugurated in 2018 and the July 3, 2020 protest at which Mr. Minett was arrested, NYPD members continued to violate the rights of witnesses, observers, and those seeking to document uniformed police activities in public places on a persistent and widespread basis, flouting the requirements of PG § 203-29. For example, the *Gray* complaint referred to below and incorporated by reference herein includes a litany of examples of such NYPD misconduct.

49.     And, although Defendants de Blasio, Shea, Hart, O'Hare, and Doe 7, at a minimum, knew or should have known that NYPD members were violating the rights of witnesses, observers, and those seeking to document uniformed activities in public places on a persistent and widespread basis, including in connection with the Summer 2020 Protests, the FTP4 Protest, and the July 3, 2020 protest at which Mr. Minett was arrested, they failed to train,

supervise, or discipline the responsible NYPD members, ratifying their misconduct and sending the clear message that NYPD and Defendant City brass endorse and support it.

### C.  The Summer 2020 Protests and the NYPD's Response

50.     The City's and NYPD's responses to the summer 2020 Black Lives Matter protests (the "Summer 2020 Protests") in general, and to the June 4, 2020 FTP4 protest in particular, were the subject of broad public scrutiny as they unfolded and have since given rise to substantial litigation in federal and state courts as well as investigations by non-governmental entities the New York State Attorney General, the New York City Council, and other governmental agencies. Plaintiff incorporates by reference the facts contained in the governmental reports that have been issued concerning Defendants' responses to the Summer 2020 Protests, including the reports issued by the New York State Office of the Attorney General[2], the New York City Office of the Corporation Counsel[3], and the New York City Department of Investigation.[4]

51.     Plaintiff further incorporates by reference the facts contain in the reports that have been issued by non-governmental agencies concerning Defendants' responses to the FTP4 protest, including, but not limited to, the September 2020 Human Rights Watch written analysis

---

[2] Letitia James, Attorney General, State of New York, *Preliminary Report on the New York City Police Department's Response to Demonstrations Following the Death of George Floyd,* available at https://ag.ny.gov/sites/default/files/2020-nypd-report.pdf.
[3] Margaret Garnett, Commissioner, New York City Department of Investigation*, Investigation into NYPD Response to the George Floyd Protests*, ("DOI Report"), Dec. 2020, available at https://www1.nyc.gov/assets/doi/reports/pdf/2020/DOIRpt.NYPD%20Reponse.%20GeorgeFloyd%20Protests.12.18.2020.pdf.
[4] New York City Law Department, *Corporation Counsel Report Pursuant to Executive Order 58 (June 20, 2020) Directing an Analysis of Factors Impacting the George Floyd Protests in New York City* (Dec. 2020) ("OCC Report"), available at https://www1.nyc.gov/assets/law/downloads/pdf/ProtestReport-np.pdf.

of the NYPD's response to the Mott Haven Protest (the "HRW Report")[5] and video report[6], and the Physicians for Human Rights reports: "'A Targeted Attack on the Bronx' - Police Violence and Arrests of Health Workers at a New York City Protest"[7] and "Expert Statement on Individual and Community Effects from Trauma Due to NYPD Use of Force in Response to the Mott Haven Protest on June 4, 2020."[8]

52.     Plaintiff further incorporates by reference the factual allegations set forth in other federal civil rights complaints in cases pending in the United States District Court for the Southern District of New York arising from Defendants' responses to the Summer 2020 Protests that support Plaintiffs' claims against Defendants in this case, including:

   a.  *Sow et al v. City of New York et al,* 20-cv-00533(CM)(GWG);

   b.  *People of the State of New York v. City Of New York et al*, 21-cv-322 (CM)(GWG);

   c.  *Payne et al v. De Blasio et al*, 20-cv-8924 (CM)(GWG);

   d.  *Sierra et al v. City of New York et al*, 20-cv-10291 (CM)(GWG);

   e.  *Wood v. De Blasio et al*, 20-cv-10541 (CM)(GWG);

   f.  *Yates v. City of New York, et al.,* 21-cv-01904 (CM)(GWG);

   g.  *Campbell v. City of New York,* 21-cv-04056 (AJN); and

   h.  *Gray, et al., v. City of New York, et al.,* 21-cv-06610 (CM)(GWG).

53.     Of those, the following complaints contain factual allegations specific to the Mott Haven Protest (by way of a representative, not exhaustive, list): *People*, ¶¶ 58, 169-170, 247-255,

---

[5] Human Rights Watch, "Kettling" Protesters In The Bronx: Systemic Police Brutality And Its Costs In The United States ("HRW Report"), Sept. 30, 2020, *available at* https://www.hrw.org/report/2020/09/30/kettling-protesters-bronx/systemic-police-brutality-and-its-costs-united-states.

[6] Human Rights Watch, "NYPD Beat and Arrest Peaceful Protesters in Planned Assault," Sept. 30, 2020, *available at* https://www.youtube.com/watch?v=ovsQoElXzl8.

[7] Phelim Kine and Joanna Naples-Mitchell, September 2020, *available online at* https://phr.org/wp-content/uploads/2020/09/A-Targeted-Attack-on-the-Bronx_Police-Violence_Sept-2020.pdf.

[8] Michele Heisler, et al., April 2021, *available online at* https://phr.org/wp-content/uploads/2021/04/PHR-Mott-Haven-Protest-Expert-Statement-April-2021.pdf.

284-310, 366- 387; *Wood*, ¶¶ 116-167; *Payne*, ¶¶ 59-65, 161- 173, 182-192, 194-200; *Sierra*, ¶¶ 41-124; and *Sow*, ¶¶ 86-93, 310-329, 332-345, 348-390, 392-418.

54.     Of those, the following complaints contain factual allegations specifically about the *Hernandez* Legal Observer Plaintiffs (by way of a representative, not exhaustive, list): *People*, ¶¶ 262-297; *Wood*, ¶123; *Payne*, ¶¶ 62, 65; *Sierra*, ¶ 71; *Sow*, ¶¶ 91, 109, 122

55.     Plaintiff incorporates by reference the allegations in the Complaint in *Gray, et al., v. City of New York, et al.,* 21-cv-06610 (CM)(GWG) supporting the municipal liability claim therein, including, but not limited to, the allegations in ¶¶ 2-7 and 95-129 therein.

56. As stated in ¶ 7 of the *Gray* Complaint:

> The NYPD has demonstrated a longstanding custom, pattern and practice of unlawfully interfering with the recording of police activity conducted in public view – a pattern revealed with clarity during the protests in New York City following the death of George Floyd in the summer of 2020 (the "George Floyd Protests"). This custom, pattern, and practice is the result of a lack of adequate training regarding the First Amendment rights of the press and public to record police activities in public, a failure to supervise and discipline officers who retaliate against or interfere with this right, and deliberate indifference by NYPD supervising personnel to a culture of disregard for the constitutional right to record police activity in public.

**D.  Plaintiff Ryan Minett's July 3, 2020 arrest and prosecution**

57.     On the morning of July 3, 2020, Mr. Minett was acting as a volunteer Legal Observer for the NLG-NYC in and around the northeastern end of City Hall Park, where the physical footprint of the 24-hour "Occupy City Hall" encampment-style demonstration had been situated since late June.

58.     At some point in the morning, some of the protesters present used an online database related to police misconduct called "CAPstat" (available online at https://www.capstat.nyc/) to search records related to some of the NYPD members present.

14

59.     Across Centre Street from City Hall Park, near the David Dinkins building at One Centre Street, some protesters began to read information from CAPstat about certain NYPD members who were present in the area of, and around, those NYPD members themselves.

60.     At around that time, Defendant NYPD Deputy Inspector Robert O'Hare arrived at the scene and began walking around, including around and among the relatively small number of protesters who were in the immediate area at the time.

61.     One protester began to make statements that Mr. Minett understood to be related to allegations against Defendant O'Hare.

62.     Mr. Minett was in the area, prominently wearing his bright green NLG-NYC Legal Observer hat as well as his NLG-NYC Legal Observer badge.

63.     Defendant O'Hare responded by picking up the pace of his walking a, crossing the street to the south of the Brooklyn Bridge promenade entrance, and retreating behind the fence and locked gates of City Hall.

64.     Some protesters followed after when Defendant O'Hare crossed the street and remained on the other side of the City Hall fence after Defendant O'Hare went through the locked gates and behind the City Hall fence.

65.     Mr. Minett followed those protesters.

66.     Some protesters remained on the eastern (outside) side of the City Hall fence after Defendant O'Hare went past the fence, continuing to read or talk about police misconduct allegations.

67.     At around that time, a number of NYPD Strategic Response Group ("SRG") members emerged from around the City Hall building, exited the locked gates onto the sidewalk where the protesters were, and began to surround the protesters.

15

68.     At around that time and location, NYPD members arrested one of the protesters (hereinafter, "ZZ" or the "Protester").

69.     After ZZ's arrest, many protesters retreated from the sidewalk near the entrance to City Hall, moving toward the Occupy City Hall encampment further north in City Hall Park.

70.     Mr. Minett followed protesters as they moved to the north and into the Occupy City Hall encampment.

71.     At around that time, both protesters and Mr. Minett began to process that ZZ had been arrested.

72.     Given that he was volunteering as a Legal Observer, Mr. Minett was particularly concerned to document at least ZZ's name and where the NYPD would be taking him for arrest processing.

73.     At that point, Mr. Minett moved out from behind the line of protesters and moved south again, back toward the City Hall entrance around where ZZ had been arrested.

74.     As he moved to the south, Mr. Minett encountered a number of NYPD SRG members who were physically blocking the sidewalk to the south, impeding pedestrian traffic from proceeding south on the sidewalk.

75.     At around that time, Mr. Minett saw a NYPD prisoner transport vehicle farther to the south, so Mr. Minett proceeded around the SRG members to the south.

76.     When Mr. Minett arrived in the area of the NYPD prisoner transport vehicle, he began asking ZZ for his last name and asking the NYPD members who were present where they were taking ZZ.

77.     Mr. Minett asked Defendant O'Hare: "Deputy Inspector O'Hare, what Precinct are you taking him to?"

16

78.     Within seconds, Defendant O'Hare then said, "Let's go, under arrest," arresting Mr. Minett.

79.     Defendant O'Hare then said to the other NYPD members present, "He's under arrest," instructing other NYPD members who were present to assist him in the arrest.

80.     Mr. Minett responded by walking compliantly with Defendant O'Hare behind a line of NYPD members and asking: "Are you kidding me?"

81.     Defendants Does 1-6, all of whom had been within a few feet of Mr. Minett just before Defendant O'Hare ordered his arrest and arrested Mr. Minett, then took custody of Mr. Minett.

82.     Defendants 1-6 took custody of Mr. Minett within a few feet of Defendant John Doe 7 NYPD Legal Bureau Supervisor.

83.     Defendants Does 1-6 surrounded Mr. Minett.

84.     Several of Defendants Does 1-6 assisted each other in putting metal handcuffs on Mr. Minett in an excessively tight manner.

85.     At some point later, Mr. Minett asked

86.     NYPD members among Does 1-6 then searched Mr. Minett and took some of his property, including, but not limited to, his NLG-NYC Legal Observer hat.

87.     Additionally, Defendant O'Hare took Mr. Minett's Legal Observer Notes, claiming to a bystander that Mr. Minett had "threw it away."

88.     Several of Defendants Does 1-6 then took Mr. Minett to the nearby NYPD prisoner transport vehicle, where they waited with him in line outside the vehicle.

89.     At the same time, Defendant O'Hare consulted with Defendant Doe 7 and a NYPD white-shirted supervisor.

90.     Over the next few minutes, bystanders and observers repeatedly asked the individual Defendants who were present why they had arrested a Legal Observe and verbally protested Mr. Minett's arrest, saying things like, "You can't arrest a Legal Observer."

91.     NYPD members loaded Mr. Minett into the NYPD prisoner transport vehicle with ZZ and other arrestees.

92.     Eventually, NYPD members transported Mr. Minett and ZZ to the NYPD's 7th Precinct for arrest processing.

93.     Mr. Minett and ZZ remained at the NYPD's 7th Precinct for around five hours, where they were lodged in the same cell.

94.     After around five hours, NYPD members transported Mr. Minett to Manhattan Central Booking and turned Mr. Minett over to the custody of the New York City Department of Correction ("DOC") for pre-arraignment processing.

95.     At around 10:00AM on July 4, 2020, Mr. Minett was arraigned in the New York City Criminal Court.

96.     At around 12:20AM on July 4, 2020, Defendant NYPD Officer Christopher Emmart swore out an accusatory instrument against Mr. Minett in which he swore that Defendant O'Hare hard informed him that Defendant  Mr. Minett had engaged in illegal conduct that Mr. Minett had not, in fact, engaged in.

97.     For example, Defendants Emmart and O'Hare claimed in that sworn accusatory instrument that:

    a. Defendant O'Hare saw Mr. Minett, ZZ, and "at least 3 other unapprehended individuals surround him" at around 10:40 A.M. in front of 1 Centre Street;

    b. Defendant O'Hare saw ZZ "directly behind him using a bullhorn and screaming into the bullhorn" as Mr. Minett was in front of Defendant O'Hare, thereby "blocking" Defendant O'Hare's "ability to move and preventing him

18

from conducting official duties, namely patrol";

  c. Defendant O'Hare "heard two other unapprehended individuals state in substance: 'You ain't going nowhere' and 'You're going to fight all of us'";

  d. Mr. Minett, ZZ, "and at least 3 other unapprehended individuals blocked his path, requiring him to leave the sidewalk and walk into the road to attempt" [sic];

  e. Mr. Minett, ZZ, "and at least 3 other unapprehended individuals blocked his path again, requiring him to leave the road and walk to the sidewalk"; and

  f. Mr. Minett's and ZZ's "actions also caused" Deputy Inspector O'Hare "to fear for his physical safety, and caused alarmed and serious annoyance".

98. The statements by Defendants Emmart and O'Hare based on which Mr. Minett was prosecuted were materially false.

99. For example, Mr. Minett did not surround Defendant O'Hare, block his path, or impede his ability to move or conduct patrol, nor did Mr. Minett use a bullhorn, or act in concert with ZZ or "other apprehended individuals."

100. Nevertheless, a result of the allegations by Defendants O'Hare and Emmart, Mr. Minett stood charged with several misdemeanor criminal offenses as well as several violations, including claimed violations of:

  a. New York Penal Law ("PL") Section 195.05 – Obstructing Governmental Administration in the Second Degree;

  b. PL Section 120.15, Menacing in the Third Degree;

  c. New York City Administrative Code Section 10-108(d) – Regulation of Sound Devices or Apparatus;

  d. PL Section 240.20(5) – Disorderly Conduct; and

  e. POL Section 240.26(3) – Harassment in the Second Degree.

101. At Mr. Minett's arraignment, he was released on his own recognizance pursuant to New York Criminal Procedure Law ("CPL") Section 510.40(2), and, as such, he was required

to remain subject to the orders and processes of the court throughout the duration of his criminal prosecution.

102.     The case was put over until October 1, 2020 for conversion through a supporting deposition from Defendant O'Hare attesting to the truth of the allegations Defendant Emmart swore to in the charging instrument.

103.     On October 1, 2020, the case was administratively adjourned until January 5, 2021 for conversion.

104.     On January 5, 2021, the Office of the District Attorney of New York County did not have the supporting deposition from Defendant O'Hare, and the case was adjourned to February 8, 2021, for conversion, one final time.

105.     On January 28, 2021, the Office of the District Attorney of New York County requested that the case against Mr. Minett be advanced for dismissal, giving the reason: "MTD 30.30 – unable to comply with discovery obligations."

106.     Upon information and belief, "MTD" stands for "motion to dismiss" and "30.30" refers to CPL Section 30.30 which relates to speedy trial requirements.

107.     On February 8, 2021, all charges against Mr. Minett were dismissed by the New York City Criminal Court on grounds consistent with Mr. Minett's innocence of the underlying charges.

108.     Records and information regarding the case were later dismissed and sealed consistent with CPL Section 160.50 and/or 160.55.

109.     Defendants' violations of Mr. Minett's rights on July 3, 2020, including, but not limited to, in arresting him, prevented him from performing, and/or interfered with his ability to perform, his function as a Legal Observer on July 3, 2020.

110.    Defendants' violations of Mr. Minett's rights on July 3, 2020, including, but not limited to, in arresting him, interfered with and deprived Mr. Minett of his associational and free speech and expression rights on July 3, 2020.

111.    And, although most Mr. Minett has acted as a volunteer Legal Observer in the time between July 3, 2020 and now and intends to volunteer as a Legal Observer in the future, Defendants' violations of Mr. Minett's rights on July 3, 2020, including, but not limited to, in arresting him, cast and continues to cast a chill on Mr. Minett's ability and desire to act as Legal Observers in the future.

112.    Additionally, the pendency of Mr. Minett's criminal charges between July 3, 2020 and February 8, 2021 negatively impacted his ability to pursue and engage in legal work to advance his legal studies and/or his legal career, and otherwise damaged and injured him.

**E.  Defendants' de Blasio's, Shea's, and Hart's Ratifications of their Subordinates' Misconduct and Failures to Monitor, Supervise, Monitor, and Discipline NYPD Members Regarding the NYPD FTP4 Protest Response and the Legal Observer Arrests and Mr. Minett's arrests.**

113.    Although defendants City, Shea, Hart, and other policymakers actually knew, or should have known, that NYPD members were engaging in or had engaged in the unconstitutional and unlawful conduct complained of in the *Hernandez* complaint and herein, they failed to monitor, supervise, and/or discipline NYPD members who directed, engaged, or observed such conduct.

114.    For example, Defendants de Blasio and Shea made public statements on social media and in the media indicating they had knowledge of events related to violence and mass arrests at the Summer 2020 protests as they were unfolding, and, of course, a wealth of video and other evidence was widely available online.

115.    With respect to the *Hernandez* Plaintiffs in particular, images of NYPD officers arresting NLG-NYC Legal Observers began to circulate online almost immediately.

116.    On June 7, 2020, the NLG-NYC sent a letter regarding "Legal Observer Targeting and Detentions" to Defendant Shea, copying a number of other officials, including the Defendants de Blasio and Hart; the New York City Corporation Counsel; the New York City Public Advocate; and the New York State Attorney General.

117.    In that June 7, 2020 letter, the NLG-NYC "condemn[ed]" the NYPD's "unlawful targeting and detention of…trained and clearly identified" NLG-NYC Legal Observers on June 4, 2020 in the Bronx.

118.    The NLG-NYC also identified the NYPD Legal Bureau attorney and described how he verbally authorized the arrests of NLG-NYC Legal Observers and pointed toward NLG-NYC Legal Observers, after which NYPD officers grabbed and handcuffed NLG-NYC Legal Observers.

119.    Finally, the NLG-NYC letter demanded that the NYPD: "(1) remind all NYPD officers of the status and role of Legal Observers via a FINEST message and citywide department announcements to be made at roll calls in the presence of all working officers; and (2) discipline those officers, including the NYPD Legal Bureau officers present, who supervised, and were otherwise involved in, detaining and searching the LO's and violating the confidentiality of their LO notes."

120.    The June 7, 2020 NLG-NYC letter resulted in press coverage by *Gothamist*[9] and

*The New York Law Journal*[10] – but no response to the NLG-NYC from Defendants Shea, Hart,

or anyone else.

121.    Upon information and belief, to this date, there has been no response from any of

the Defendants, or any representative of Defendant City, to the June 7, 2020 NLG-NYC letter.

122.    On June 17, 2020, the New York City Bar Association (the "City Bar") issued a

"Statement on Detention of Legal Observers" (the "City Bar Statement").[11]

123.    In the City Bar Statement, the City Bar said it was "gravely concerned by recent

reports in the United States of concerted efforts by police forces to target legal observers",

focusing on the facts surrounding the June 4, 2020 detentions and arrests of the NLG-NYC LOs

in the Bronx while noting that "[t]he targeting of legal observers by police is also occurring

outside New York". The City Bar Statement concluded:

> The fact that legal observers have become targets for the police indicates that
> policing strategies in these communities have failed. First, these attacks
> [against Legal Observers] suggest a failure to adequately train police serving
> on crowd control details to identify legal observers who are monitoring
> protests as non-targets.  Second, the systematic targeting of legal observers
> contributes to a growing concern that recent police actions are entirely
> disproportionate to officers' narrow duties to maintain security while honoring
> the First Amendment rights of protesters.  Third, and most egregiously, the
> reports of police warnings that legal observers are in the area, the subsequent
> targeting and detention of those observers, and the forced disclosure of
> privileged material indicates a startling disregard by police forces that their
> conduct is governed in our society by the rule of law.

---

[9] *See* Jake Offenhartz, "'Round Up The Green Hats': NYPD Accused Of Deliberately Targeting Legal Observers In
Brutal Bronx Mass Arrest", *Gothamist* (June 8, 2020), available online at  https://gothamist.com/news/round-green-
hats-nypd-accused-deliberately-targeting-legal-observers-brutal-bronx-mass-arrest.
[10] *See* Jane Wester, "Letter Demands NYPD Discipline After Legal Observers Were Detained, Illegally Searched
During Bronx Protest," *The New York Law Journal* (June 8, 2020), available online at
https://www.law.com/newyorklawjournal/2020/06/08/letter-demands-nypd-discipline-after-legal-observers-were-
detained-illegally-searched-during-bronx-protest/.
[11] A copy of the Statement on Detention of Legal Observers is also available online at
https://www.nycbar.org/media-listing/media/detail/statement-on-detention-of-legal-observers.

The City Bar strongly condemns all attacks on legal observers and urges state and local governments, police chiefs, and police unions both to advise their officers that attacks on legal observers are not tolerated, and also to swiftly investigate any incident involving the detention or use of force against a legal observer, and where warranted, prosecute offenders. As protests and other demonstrations continue, the City Bar specifically calls on Mayor Bill de Blasio and Police Commissioner Dermot Shea to immediately investigate the incident in the Bronx, and for all officers in the NYPD to be made aware that the consequences of any illegal targeting of legal observers by police will be swift and severe, including appropriate disciplinary charges and criminal prosecution.

124.    The June 17, 2020 City Bar Statement resulted in press coverage *The New York Law Journal*[12] but no response from Defendants Shea, Hart, or anyone else.

125.    Upon information and belief, to this date, there has been no response from any of the Defendants, or any representative of Defendant City, to the June 17, 2020 City Bar Statement.

126.    Each of the *Hernandez* Plaintiffs provided written statements to, and made oral statements to, the New York Civilian Complaint Review Board ("CCRB") and the Office of the Attorney General ("OAG") as part of those agencies' investigations into the events of June 4, 2020 and the Summer 2020 Protests.

127.    High-level policymakers for Defendant City, including Defendants de Blasio, Shea, Monahan, and Hart, knew that those investigations were underway as early as June of 2020, yet, as Mr. Minett's arrest and prosecution demonstrates, they have not taken meaningful steps to discipline involved NYPD members, or take other steps to ensure that the Legal Observer arrests such as those at issue in *Hernandez* and in this lawsuit do not continue to occur.

---

[12] *See* Jane Wester, "City Bar Calls For Investigation Following Arrests of Legal Observers During Bronx Protests", *The New York Law Journal* (June 17, 2020), available online at https://www.law.com/newyorklawjournal/2020/06/17/city-bar-calls-for-investigation-following-arrests-of-legal-observers-during-bronx-protests/.

128.    For example, during Defendant Shea's June 22, 2020 testimony in the OAG's investigation regarding the NYPD's policing of the Summer 2020 Protests, including the events of June 4, 2020, the following exchange occurred[13]:

> **AG James**: There are also Legal Observers who were arrested as a result of this protest. Is there not a directive from the mayor and or yourself to police officers that legal observers and essential workers should not be arrested after the curfew?
>
> **Commissioner Shea**: Yeah, I would have to see how you're defining Legal Observers, I'm not sure what you're referring to there.
>
> **AG James**: There were individuals who were clearly, they had clearly marked on their caps, as well as on their shirts, that they were Legal Observers. Nonetheless there is video, and some testified last week, that they were arrested, nonetheless.
>
> **Commissioner Shea**: Right, I would just point out to the board here that having a shirt or a hat that says Legal Observer, does not mean that person is an attorney, does that not mean [sic] that they're actually performing any legal function. We go on the facts in front of us, and we had incidents of many people committing crimes and violations, and we responded to those facts.
>
> **AG James**: So do you ever interview the individuals that you arrest to determine whether or not in fact they are acting as a Legal Observer?
>
> **Commissioner Shea**: We have conversations with people literally non-stop throughout the protest, and certainly during the arrest process, but that's after their rights are read to them so we will question them if it's appropriate.

129.    On September 30, 2020, HRW published the HRW Report.

130.    On October 2, 2020, Defendant de Blasio appeared on WNYC's *The Brian Lehrer Show: Ask the Mayor*, and the following exchange occurred among Brian Lehrer, *Hernandez Plaintiff David Holton*, and Defendant de Blasio:

---

[13] *See* "Attorney General James Questions NYPD Commissioner Shea in Ongoing Investigation into Interactions Between Police and the Public*"* at Minute 44:58 – 46:30 *(*June 22, 2020), available online at https://ag.ny.gov/NYPDtestimony; *see also* Jane Wester, "NYPD Commissioner Testifies Before AG James on Protest Response, Treatment of Legal Observers," *The New York Law Journal* (June 22, 2020), available online at https://www.law.com/newyorklawjournal/2020/06/22/nypd-commissioner-testifies-before-ag-james-on-protest-response-treatment-of-legal-observers/.

**Brian Lehrer:** David in White Plains. You're on WNYC with the mayor. Hello, David.

**David Holton:** Hello, good morning. My name is David. I'm a law student in Queens. I'm a legal observer for the National Lawyers Guild. I'm calling about a protest which I observed on June 4th in the Bronx when a large number of protesters were arrested. Also, all the legal observers were arrested at the same time. We've been calling this the Mott Haven Kettle. My question is related to the curfew. At that time, you'll recall there was an 8:00 PM curfew. We, legal observers, had documentation from the mayor's office, saying that we were essential workers. Now the NYPD is claiming that we were not essential workers and were thus out past curfew. My question is, who's right there? Were we essential workers or not?

**Mayor de Blasio:** Yes, you were. With all due respect to NYPD, the NYPD is wrong on this one. Legal observers-- Look, as someone who's protested a lot myself over the years, there is a sacred role played by legal advisors. Excuse me, legal observers. They need to be treated with deference. As you said, very important point you made, David. You had documentation proving you were legal observers. That is an essential role. That is part of how we protect our democratic rights.[14]

If someone didn't have documentation, if their status was unclear, I can understand there could be some confusion, but a legal observer doing what a legal observer is supposed to identify themselves and clarify their role, of course, they're not supposed to be arrested. If, and God forbid someone committed a specific crime, that's a different matter, obviously. If you're talking about their role, observing, protecting people's rights, of course, they're essential workers. Of course, they're not supposed to be arrested.

131.    The DOI Report, which was completed and published in December of 2020, acknowledged Plaintiffs' arrests and other misconduct committed against them at the FTP4 Protest, and that a number of Defendants, including Defendant de Blasio, were aware of the *Hernandez* Plaintiffs' arrests and misconduct committed against them at the FTP4 Protest. *See, e.g.,* DOI Report pp. 21, 41.

132.    For example, according to the December 2020 DOI Report at pp. 43-44, then-NYPD Deputy Chief Terence Monahan stated that "the NYPD Legal Bureau made the

---

[14] *The Brian Lehrer Show: Ask the Mayor: 'Testing, Testing, Testing'*, WNYC, Oct. 2, 2020, available at https://www.wnyc.org/story/ask-mayor-covid-19-testing (14:30-16:30).

determination authorizing the arrests of" the *Hernandez* Plaintiffs and that when Monahan

learned of the arrests, he claimed, "he ordered their release":

> "*Legal Observers, Medics, and Journalists*. Numerous media reports, along with reports and letters from nongovernmental organizations, noted detentions and arrests of legal observers, medical volunteers, and journalists during the Floyd protests. While not the only instance of alleged interference with legal observers, the NYPD response at Mott Haven resulted in the detention of legal observers, who were reportedly zip tied and shoved to the street, when police executed mass arrests for curfew violations. The Chief of Department stated during his interview that staff from the NYPD Legal Bureau made the determination authorizing the arrest of the legal observers. He also confirmed that when he learned of the arrests of legal observers, he ordered their release. The President of the National Lawyers Guild wrote letters arguing that the detention of legal observers violated the Patrol Guide and was contrary to assurances from City Hall staff that legal observers, as well as medics, were exempt from the curfew. Elected officials also noted those prior assurances. In its written response, the NYPD stated that legal observers were not within the scope of the Executive Order's "Essential Workers" exemption from the curfew. Nonetheless, the purpose of legal observers is to monitor protests for police activity that may infringe upon the civil rights of protesters."[15]

133.   According to a partial transcript of an interview Defendant Shea gave to the DOI

prior to December of 2020[16], Defendant Shea could not answer whether Legal Observers have

certain protection at protests" Defendant Shea said he "would defer that to the lawyers, both in

your house, City Hall, as well as our Legal Bureau" but he could not answer the question.[17]

134.   Although he was "racking [his] brain" he could not say whether there were any

NYPD policies in place related to the presence of Legal Observers at events.[18]

135.   When the interviewer posed the same question another way, asking, "Does the

NYPD have specific protections for Legal Observers," Defendant Shea again did not answer the

---

[15] *Id.* at 44; *see also id.* at 78-79.
[16] *See* Margaret Garnett, Commissioner, The City of New York Department of Investigation, *DOI's interviews with New York Police Commissioner Dermot Shea conducted as part of DOI's December 18, 2020, report* ("Shea DOI Interview"), available at https://www1.nyc.gov/assets/doi/oignypd/response/Commissioner_DermotShea.pdf.
[17] *See* Shea DOI Interview p. 35.
[18] *See* Shea DOI Interview p. 54.

question, instead referring to some vague memory of a "situation" he claimed he "had seen",

statting: "if there is a situation where they are arrested, what I have seen is, that they are

committing violations under the guise of being, whether it is an essential worker or legal

observers or something along those lines."[19]

136.    According to a partial transcript of an interview Monahan gave to the DOI prior to

December of 2020, Monahan repeatedly said that there were no NYPD policies in place

regarding Legal Observers and that Legal Observers "had to obey the same laws that everyone

else did" and "had no special privilege."[20]

137.    As seen above, Defendants de Blasio, Shea, Hart, O'Hare, and other high-level

NYPD policymaking officials knew about the *Hernandez* Plaintiffs' and/or Mr. Minett's arrests

while acting as NLG-NYC Legal Observers and other misconduct committed by NYPD

members against them, but failed properly to train, supervise, investigate, or discipline their

subordinates as a result of that knowledge.

### **FIRST CLAIM FOR RELIEF**

**Unlawful Seizure / False Arrest**
***Pursuant to 42 U.S.C. § 1983 for Defendants' Violations of Plaintiff's Rights Under the
Fourth and Fourteenth Amendments to the United States Constitution***

138.    Plaintiff incorporates by reference the allegations set forth in all preceding and

following paragraphs as if fully set forth herein.

139.    Defendants did not have probable cause to seize, detain, or arrest Plaintiff.

---

[19] *Id.*
[20] *See* Margaret Garnett, Commissioner, The City of New York Department of Investigation, *DOI's interviews with New York Police Chief of Department Terence Monahan conducted as part of DOI's December 18, 2020, report* ("Monahan DOI Interview"), available at
https://www1.nyc.gov/assets/doi/oignypd/response/ChiefofDepartment_TerenceMonahan.pdf, at pp. 46-47.

140.     Defendants seized Plaintiff without a written judicial warrant authorizing them to do so.

141.     Defendants' seizure of Plaintiff was without privilege or lawful justification.

142.     Plaintiff did not consent and were conscious of the confinement by Defendants.

143.     As a result of Defendants' acts and omissions, Defendants deprived Plaintiff of Plaintiff's federal, state, and/or other legal rights; caused Plaintiff bodily injury, pain, suffering, psychological and/or emotional injury, and/or humiliation; caused Plaintiff to expend costs and expenses; and/or otherwise damaged and injured Plaintiff.

144.     Defendants' unlawful conduct was willful, malicious, oppressive, and/or reckless, and was of such a nature that punitive damages should be imposed against them.

## SECOND CLAIM FOR RELIEF

### Excessive Force
*Pursuant to 42 U.S.C. § 1983 for Defendants' Violations of Plaintiff's Rights Under the Fourth and Fourteenth Amendments to the United States Constitution*

145.     Plaintiff incorporates by reference the allegations set forth in all preceding and following paragraphs as if fully set forth herein.

146.     Defendants' use of force against Plaintiff was unjustified and objectively unreasonable, taking into consideration the facts and circumstances that confronted Defendants.

147.     As a result of Defendants' acts and omissions, Defendants deprived Plaintiff of Plaintiff's federal, state, and/or other legal rights; caused Plaintiff bodily injury, pain, suffering, psychological and/or emotional injury, and/or humiliation; caused Plaintiff to expend costs and expenses; and/or otherwise damaged and injured Plaintiff.

148.     Defendants' unlawful conduct was willful, malicious, oppressive, and/or reckless, and was of such a nature that punitive damages should be imposed against them.

## THIRD CLAIM FOR RELIEF

**For Violations of Plaintiff's First Amendment Rights,**
**Including Under Retaliation and Time/Place/Manner Theories of Liability**
*Pursuant to 42 U.S.C. § 1983 for Defendants' Violations of Plaintiff's Rights Under the First*
*and Fourteenth Amendments to the United States Constitution*

149.    Plaintiff incorporates by reference the allegations set forth in all preceding and following paragraphs as if fully set forth herein.

150.    Defendants retaliated against Plaintiff for engaging in speech and/or conduct protected by the First Amendment.

151.    Defendants engaged in the acts and omissions complained of herein in retaliation for Plaintiff's protected speech and/or conduct.

152.    Defendants engaged in the acts and omissions complained of herein in order to prevent Plaintiff from continuing to engage in such protected speech and/or conduct.

153.    Defendants engaged in the acts and omissions complained of herein in order to prevent and/or discourage Plaintiff from engaging in similar protected conduct in the future.

154.    Upon information and belief, Defendants engaged in the acts and omissions complained of herein with respect to Plaintiff's First Amendment-based claims—including the related municipal liability claims involving the adoption or implementation of policies, practices, and/or customs and/or related failures to train, supervise, and/or discipline—with malice.

155.    Defendants imposed restrictions on Plaintiff's protected speech and/or conduct that violated Plaintiff's First Amendment rights, including, but not limited to, in subjecting Plaintiff to excessive force, false arrest and detention, malicious and false prosecution, and in

otherwise violating Plaintiff's rights and engaging in the acts and omissions complained of herein.

156.    In addition to being retaliatory, the restrictions Plaintiff complained of herein that Defendants imposed on Plaintiff's First Amendment rights to participate in, observe, and/or stand nearby speech, conduct, association, and/or other expressive activities protected by the First Amendment on the streets, were themselves regulations on Plaintiff's protected conduct that:

   a.   Were viewpoint discriminatory and/or otherwise not content-neutral, and were not necessary, and precisely tailored, to serve compelling governmental interests, and/or were not the least restrictive means readily available to serve those interests; or, alternately,

   b.   Were content-neutral, but lacked narrow tailoring to serve a significant governmental interest, in that they burdened substantially more protected speech and/or conduct than necessary to serve those interests, and/or failed to provide ample alternatives for Plaintiff's protected expression, including in that Plaintiff's abilities to communicate effectively were threatened; and/or

   c.   Afforded Defendants unbridled or otherwise inappropriately limited discretion to limit or deny Plaintiff's ability to engage in protected conduct (also raising constitutionally significant Due Process-based vagueness and/or overbreadth concerns); and/or

   d.   Amounted to the imposition of strict liability on Plaintiff for engaging in protected speech and/or expression.

157.    As a result of Defendants' acts and omissions, Defendants deprived Plaintiff of Plaintiff's federal, state, and/or other legal rights; caused Plaintiff bodily injury, pain, suffering, psychological and/or emotional injury, and/or humiliation; caused Plaintiff to expend costs and expenses; and/or otherwise damaged and injured Plaintiff.

158.    Defendants' unlawful conduct was willful, malicious, oppressive, and/or reckless, and was of such a nature that punitive damages should be imposed against them.

## FOURTH CLAIM FOR RELIEF

### Deprivation of Fair Trial Rights
*Pursuant to 42 U.S.C. § 1983 for Defendants' Violations of Plaintiff's Rights Protected Under the Fifth, Sixth, and Fourteenth Amendments to the United States Constitution*

### Against Defendants O'Hare and Emmart

159.    Plaintiff incorporates by reference the allegations set forth in all preceding and following paragraphs as if fully set forth herein.

160.    Defendants O'Hare and Emmart fabricated evidence of a material nature, likely to influence a jury's decision, intentionally forwarded that evidence to prosecutors, as a result of which Plaintiff suffered liberty deprivations and other injuries.

161.    As a result of Defendants' acts and omissions, Defendants deprived Plaintiff of Plaintiff's federal, state, and/or other legal rights; caused Plaintiff's bodily injury, pain, suffering, psychological and/or emotional injury, and/or humiliation; caused Plaintiff to expend costs and expenses; and/or otherwise damaged and injured Plaintiff.

162.    The unlawful conduct of the Defendants was willful, malicious, oppressive, and/or reckless, and was of such a nature that punitive damages should be imposed against them.

## FIFTH CLAIM FOR RELIEF

### Malicious Prosecution

*Pursuant to 42 U.S.C. § 1983 for Defendants' Violations of Plaintiff's Rights Protected Under the Fourth and Fourteenth Amendments to the United States Constitution*

### Against Defendants O'Hare and Emmart

163.    Plaintiff incorporates by reference the allegations set forth in all preceding and following paragraphs as if fully set forth herein.

164.    Defendants O'Hare and Emmart misrepresented and falsified evidence to the prosecutor and/or failed to make a full statement of the relevant evidence – including potentially exculpatory evidence - to the prosecutor.

165.    Defendants O'Hare and Emmart were directly and actively involved in the initiation or prosecution of criminal proceedings against Plaintiff, including by supplying and creating false information to be included in NYPD paperwork that was included in NYPD paperwork, providing falsely sworn information in accusatory instruments, and/or providing false information to the prosecutor.

166.    Defendants O'Hare and Emmart lacked probable cause to initiate and continue criminal proceedings against Plaintiff.

167.    Defendants O'Hare and Emmart acted with malice in initiating criminal proceedings against Plaintiff.

168.    Notwithstanding Defendants' misconduct, the criminal proceedings against Plaintiff were favorably terminated on the merits.

169.    As a result of Defendants' acts and omissions, Defendants deprived Plaintiff of Plaintiff's federal, state, and/or other legal rights; caused Plaintiff bodily injury, pain, suffering, psychological and/or emotional injury, and/or humiliation; caused Plaintiff to expend costs and expenses; and/or otherwise damaged and injured Plaintiff.

170.    The unlawful conduct of the Defendants was willful, malicious, oppressive, and/or reckless, and was of such a nature that punitive damages should be imposed against them.

**SIXTH CLAIM FOR RELIEF**

**Municipal Liability**
*Pursuant to 42 U.S.C. 1983 and <u>Monell v. Department of Social Services</u>, 436 U.S. 658 (1978)*
*for Defendants' Violations of Plaintiff's Rights Under the United States Constitution*

**Against Defendant City of New York**

206.    Plaintiff incorporates by reference the allegations set forth in all preceding and following paragraphs as if fully set forth herein.

207.    The facts pleaded above describe the policies, practices, and customs Defendants subjected the Plaintiff to, including, but not limited to: uses of excessive force, and false arrests, and unreasonable restrictions on Plaintiff's First Amendment-protected conduct.

208.    All of the wrongful acts or omissions complained of herein were carried out by the individual named and unnamed police officer defendants pursuant to: (a) formal policies, rules, and procedures of Defendant City; (b) actions and decisions by Defendant City's policymaking agents including, but not limited to, Defendants de Blasio, Shea, Hart, and O'Hare; (c) customs, practices, and usage of the NYPD that are so widespread and pervasive as to constitute *de facto* policies accepted, encouraged, condoned, ratified, sanctioned, and/or enforced by Defendant City, Defendants de Blasio, Shea, Hart, and O'Hare, and other policymaking officials; (d) Defendant City's deliberate indifference to Plaintiff's rights secured by the First, Fourth, Fifth, Sixth, and/or Fourteenth Amendments of the United States Constitution, as evidenced by the City's failures, and the failures of the City's policymaking agents, to train, supervise, and discipline NYPD officers, despite full knowledge of the officers' wrongful acts, as described herein.

209.    As a result of Defendants' acts and omissions, Defendants deprived Plaintiff of Plaintiff's federal, state, and/or other legal rights; caused Plaintiff bodily injury, pain, suffering,

psychological and/or emotional injury, and/or humiliation; caused Plaintiff to expend costs and expenses; and/or otherwise damaged and injured Plaintiff.

## SEVENTH CLAIM FOR RELIEF

**Violations of New York State Law**
***Pursuant to the New York State Constitution and New York State Law***

210.     Plaintiff incorporates by reference the allegations set forth in all preceding and following paragraphs as if fully set forth herein.

***Respondeat Superior* Liability**

211.     The conduct of the police officials alleged herein occurred while they were on duty and/or in and during the course and scope of their duties and functions as police officials, and/or while they were acting as agents and employees of Defendant City, clothed with and/or invoking state power and/or authority, and, as a result, Defendant City is liable to Plaintiff pursuant to the state common law doctrine of *respondeat superior*.

**Assault**

212.     Defendants committed assault within the meaning of New York common law against Plaintiff by intentionally placing Plaintiff in fear of imminent harmful or offensive contact.

**Battery**

213.     Defendants committed battery within the meaning of New York common law against Plaintiff by intentionally physically contacting Plaintiff without Plaintiff's consent.

**New York Civil Rights Law § 79-P**

214.     Prior to Plaintiff's assault, battery, and arrest, Plaintiff had been exercising his rights under New York Civil Rights Law § 79-P, the New Yorker's Right to Monitor Act, to

record law enforcement activity and to maintain custody and control over the notes in which he was doing so.

215.    Plaintiff had not physically interfered with law enforcement activity or engaged in obstruction of governmental administration or other unlawful conduct.

216.    Defendants assaulted and battered and arrested Plaintiff, seizing Plaintiff's Legal Observer notes, intentionally preventing him from further recording law enforcement activity.

**Conversion**

217.    Defendants committed conversion by intentionally taking possession of and/or interfering with Plaintiff's personal property in derogation of Plaintiff's rights.

**False Imprisonment and Unreasonable Detention**

218.    By the actions described above, the police officials described above did falsely arrest and/or imprison Plaintiff within the meaning of New York common law without reasonable or probable cause, illegally and without a written warrant, and without any right or authority to do so.

219.    Plaintiff was conscious of the confinement and it was without Plaintiff's consent.

**Negligent Hiring, Training and Supervision**

220.    Upon information and belief, Defendant City supervised, and trained the police officials described above.

**Violations of the New York State Constitution**

221.    Defendants, acting under color of law, violated Plaintiff's rights pursuant to Article I, §§ 6, 8, 9, 11, and 12 of the New York State Constitution.

222.    A damages remedy here is necessary to effectuate the purposes of Article I, §§ 6, 8, 9, 11, and 12 of the New York State Constitution, and appropriate to ensure full realizations of Plaintiff's rights under those sections.

223.    As a result of Defendants' acts and omissions, Defendants deprived Plaintiffs of their federal, state, and/or other legal rights; caused Plaintiffs bodily injury, pain, suffering, psychological and/or emotional injury, and/or humiliation; caused Plaintiffs to expend costs and expenses; and/or otherwise damaged and injured Plaintiffs.

224.    Defendants' unlawful conduct was willful, malicious, oppressive, and/or reckless, and was of such a nature that punitive damages should be imposed against them.

## DEMAND FOR A JURY TRIAL

Plaintiffs hereby demand a jury trial of all issues capable of being determined by a jury.

## DEMAND FOR JUDGMENT

WHEREFORE, Plaintiff demands judgment against the individual Defendants and the City of New York as follows:

i.    Actual and punitive damages against the individual Defendants in an amount to be determined at trial;

ii.    Actual damages in an amount to be determined at trial against the City of New York;

iii.    Statutory attorney's fees, disbursements, and costs of the action pursuant to, *inter alia,* 42 U.S.C. §1988, New York Civil Rights Law § 79-P(3)(d), and New York common law;

iv.    A declaratory judgment regarding Defendants' violations of Plaintiff's rights;

v.    Permanent injunctive relief to prevent future violations of Plaintiff's rights in the future; and

vi.    Such other relief as the Court deems just and proper.

Dated: New York, New York
       October 1, 2021

**GIDEON ORION OLIVER**


277 Broadway, Suite 1501
New York, NY  10007
t: 718-783-3682
f: 646-349-2914
Gideon@GideonLaw.com


**COHEN&GREEN P.L.L.C.**


By:
Elena L. Cohen
J. Remy Green
Jessica Massimi

1639 Centre Street, Suite 216
Ridgewood (Queens), NY 11385
    t: (929) 888-9480
    f: (929) 888-9457
    e: elena@femmelaw.com
       remy@femmelaw.com
       jessica@femmelaw.com